**<u>NOT FOR PUBLICATION</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| MICHAEL GLASS, JR., | HONORABLE KAREN M. WILLIAMS |
| Plaintiff, | |
| v. | Civil Action<br>No. 19-19839-KMW-SAK |
| UNITED PARCEL SERVICES (UPS), *et al.*, | **OPINION** |
| Defendants. | |

APPEARANCES:

ALAN HERSCHEL SKLARSKY, ESQ.
SHAUNA LAUREN FRIEDMAN, ESQ.
DAVID M. CEDAR, ESQ.
WILLIAMS CEDAR, LLC
8 KINGS HIGHWAY WEST, SUITE B
HADDONFIELD, NJ 08033

    *Counsel for Plaintiff Michael Glass, Jr.*

GARY N. STEWART, ESQ.
LOUIS HOCKMAN, ESQ.
MICHAEL G. SABO, ESQ.
RICHARD J. SEXTON, ESQ.
RAWLE & HENDERSON
401 ROUTE 73 NORTH, SUITE 200
MARLTON, NJ 08053

    *Counsel for Defendant United Parcel Services (UPS)*

NICHOLAS THOMAS FRANCHETTI, ESQ.
ARCHER & GREINER, PC
ONE CENTENNIAL SQUARE, 33 EAST EUCLID AVE
HADDONFIELD, NJ 08033

WILLIAM J. O'KANE, JR., ESQ.
ARCHER & GREINER, PC
1025 LAUREL OAK ROAD

VOORHEES, NJ 08043

*Counsel for Defendant Material Handling Systems, Inc.*
JOHN J. DELANY, III, ESQ.
MARHSALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
2000 MARKET STREET, SUITE 2300
PHILADELPHIA, PA 19103

KRISTEN LYNN KELLER, ESQ.
MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN
1000 LINCOLN DRIVE EAST, SUITE 201
MARLTON, NJ 08053

LAURA ANNE TULL, ESQ.
SEGAL MCCAMBRIDGE
1818 MARKET STREET
PHILADELPHIA, PA 19103

*Counsel for Defendant SDI Industries, Inc.*

PAUL D. KELLY, ESQ.
NICOLE MARIE MULHERN, ESQ.
MARKS, O'NEILL, O'BRIEN, DOHERTY, & KELLY, PC
CHERRY TREE CORPORATE CENTER
535 ROUTE 38 EAST, SUITE 501
CHERRY HILL, NJ 08002

GERI JAFFEE, ESQ.
MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, PC
6981 N. PARK DRIVE, SUITE 300
PENNSAUKEN, NJ 08109

*Counsel for Defendant Lyneer Staffing Solutions, LLC*

**WILLIAMS, District Judge:**

## I.   INTRODUCTION

Plaintiff Michael Glass, Jr. ("Plaintiff") brings this action against Defendants Lyneer Staffing Solutions, LLC ("Defendant Lyneer"), United Parcel Services ("Defendant UPS"), SDI Industries, Inc. ("Defendant SDI"), and Material Handling Systems, Inc. ("Defendant MHS") alleging that each Defendant contributed to the injuries Plaintiff sustained on March 8, 2018 while removing packages from the motor of a piece of conveying equipment.

This matter comes before the Court on each Defendant's Motion for Summary Judgment along with Defendant MHS's Motion to Exclude Plaintiff's Expert Testimony. (ECF Nos. 111, 112, 114, 115, 120). Plaintiff opposes all motions, (ECF Nos. 127, 128, 129, 130, 131), and Defendants replied. (ECF Nos. 138, 140, 141, 142, 143). Separately, Defendant Lyneer opposed Defendant UPS' Motion for Summary Judgment (ECF No. 124), and Defendant UPS replied. (ECF No. 126). For the reasons that follow, Defendants Lyneer, UPS, and SDI's Motions for Summary Judgment are **GRANTED**[1] and Defendant MHS's Motion for Summary Judgment and Motion to Exclude Plaintiff's Expert Opinion Testimony are **DENIED**.

## II.   BACKGROUND

In 2013, Defendant UPS purchased a conveyor system called a "TF2-3" from another facility and hired Defendant MHS as a contractor to engineer, manufacture, and install the conveyor system at issue in the Swedesboro facility, which UPS owns. MHS Def.'s Br., Defendant MHS Statement of Material Facts, ("MHS–SMF") ¶¶1, 2, 6; UPS Def.'s Br., Defendant UPS Statement of Material Facts, ("UPS–SMF") ¶¶ 2, 4. The TF2-3 conveyor is a piece of equipment that moves mail from one location in the facility to another at approximately 20 feet above the

---

[1] Pursuant to Local Civil Rule 78.1(b), this motion will be decided on the papers without oral argument.

facility floor, meaning its motor was only reachable by ascending a fixed ladder attached to the maintenance platform. MHS–SMF ¶¶6-7. The TF2-3 motor is considered a "motion hazard" and the American National Standards Institute ("ANSI") and the American Society of Mechanical Engineers ("AMSE") have promulgated standards requiring such hazards to be protected by either a guard, a device, safe distance, or safe location. *Id.* ¶10. The contract between Defendant UPS and Defendant MHS identified some items as "Owner Purchased Contractor Coordinated" ("OPCC"), which included a guard with a sliding door. *Id.* ¶¶3, 5, 6, 8.[2] Defendant MHS installed a cam locking system, which requires a unique key for access, and warning placards on the sliding doors. *Id.* ¶¶8, 11.[3] Further, MHS installed two separate disconnect switches that were OSHA compliant, which would enable authorized employees to perform a "Lock Out, Tag Out" ("LOTO") procedure. *Id.* ¶¶12-13. Once Defendant UPS performed an audit of the conveyor system, the Swedesboro facility became operational in 2014, after which Defendant MHS no longer performed any work at the facility. *Id.* ¶¶14-16.

Defendant UPS hired several independent contractors to work at the facility, most relevant being Defendant SDI which was contracted for the maintenance of the machine conveyor system, as well as Defendant Lyneer, who provided temporary personnel to staff positions, specifically to the transfer and mail sorters. UPS–SMF ¶¶6,7; Lyneer Def.'s Br., Defendant Lyneer Statement of Material Facts, ("L–SMF") ¶¶15-17.[4] Plaintiff was employed by Defendant SDI, and prior to the date of his accident, Plaintiff received a copy of the UPS Outside Contractor Procedures regarding

---

[2] Plaintiff disputes ¶3 insofar as to what the "OPCC" designation means in relation to MHS' purported responsibility to UPS and Plaintiff Glass, not that there was such a designation that delineated some items from others that were involved in the 2013 contract. *See* Pl.'s Opp. to MHS Br., Plaintiff's Responsive Statement of Material Facts ("PRSMF") ¶3.

[3] Plaintiff disputes ¶11 insofar as to whether the locking system as installed was adequate for the hazard. *See* Pl.'s Opp. to MHS Br., PRSMF ¶11.

[4] The Court notes that UPS originally contracted with Infinity Staffing Solutions, the predecessor-in-interest to Lyneer Staffing Solutions in September of 2011. L–SMF ¶15.

LOTO procedures and signed his copy. UPS–SMF ¶¶21, 22; SDI Def.'s Br., Defendant SDI Statement of Material Facts, ("SDI–SMF") ¶6.[5] Plaintiff also received weekly safety emails, and various informational print outs were posted for SDI employees. MHS–SMF ¶19. This was because Plaintiff was a maintenance technician authorized to use the LOTO disconnects for the conveyor systems at the facility to perform maintenance work within hazardous areas such as the motor cages on the TF2-3. MHS–SMF ¶18. Lyneer employees, however, were not involved in LOTO procedures at the UPS facility. L–SMF ¶22.

On the day of the incident, between 6:00 and 6:30pm, a manager for UPS notified Plaintiff that packages were accumulating in the motor cage. L–SMF ¶27; SDI–SMF ¶9. Between 9:45 and 9:50pm, Plaintiff turned off the power to the motor of the TF2-3 using the stop button underneath the maintenance platform. SDI–SMF ¶9. This action did not constitute a proper LOTO procedure, and all parties agree that Plaintiff did not follow the LOTO procedure prior to the accident. L–SMF ¶30. Plaintiff did not tell anyone else he was commencing work on the machine. L–SMF ¶29. Once reaching the platform, Plaintiff was able to open the sliding door guard despite the locks because it had been left in the locked position while opened. MHS–SMF ¶24. Plaintiff proceeded to reach into the motor cage to remove packages when the machine restarted, causing Plaintiff to sustain severe injuries to his arm. *Id*. ¶¶25-26. Plaintiff could not identify who, if anyone, reenergized the conveyor on the night of the accident. *Id*. ¶4.

## III.   LEGAL STANDARDS

### A.  Motion for Summary Judgment

---

[5] A point of contention between the parties is whether Defendant SDI properly trained Plaintiff in the LOTO procedure, or whether Plaintiff was given access to the lock out keys and tags needed to perform the LOTO procedure. Pl.'s Opp. to SDI Br., PRSMF ¶¶12, 13.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a genuine issue for trial.''" *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

IV.     **DISCUSSION**

A.  **Lyneer Staffing Solutions, LLC**

Plaintiff argues that Defendant Lyneer was negligent and asserts that one of their employees re-energized the conveyor system that caused Plaintiff's injuries. However, Plaintiff fails to point to any material fact to place anyone from Lyneer in the area at the time of the accident. The circumstantial evidence Plaintiff presents is too tenuous to hold Defendant Lyneer liable.

i.  **Negligence**

To prevail on a negligence claim, Plaintiff must provide sufficient evidence to establish a (1) duty of care, (2) a breach of that duty, (3) proximate causation, and (4) actual damages. *Estate of Allen v. Cumberland Cnty.*, No. 15-6273, 2020 WL 3468180 at *10 (D.N.J. 2020). In other words, it must be proved that one party was negligent and that negligence caused the other's injury. *Fedorczyk v. Caribbean Cruise Lines*, 82 F.3d 69, 73 (3d Cir. 1996). Causation in fact is considered "the first and most basic concept" within the element of proximate causation. *Estate of Allen*, 2020 WL 3468180 at *10. Causation in fact depends on whether an act or omission "played a material part in bringing about an event." *Fedorczyk*, 82 F.3d at 73. The "mere showing of an accident causing injuries is not sufficient from which to infer negligence,"—negligence cannot be presumed. *Id*. at 74. However, circumstantial evidence can be used to establish causation if based on sufficient probability by the preponderance of the evidence. *Id*. at 74-75. Ultimately, Plaintiff has the burden of proof to establish causation. *Id.* at 74.

Here, Plaintiff asserts that because Lyneer staff were working that night, one of their employees must have reenergized or turned on the conveyer while Plaintiff was reaching inside to free lodged packages from the motor cage. Pl.'s Opp. to Lyneer Br., at 12; PRSMF ¶¶43-45. However, Plaintiff has failed to provide sufficient evidence to demonstrate that an employee of

Defendant Lyneer was the proximate cause of his accident.[6] Despite the extensive discovery, there is no evidence of any Lyneer employees near the disconnect switch at the time of the accident: there are no records from the computer system that monitored the conveyor to show a disconnect occurred, (L–SMF ¶¶34, 38); deposition testimony and Plaintiff's own recounting of events indicates that no radio communication occurred between any employees that evening relating to the accident to suggest any Lyneer employee knew that the machine was under maintenance or knew that the machine was even de-energized, (L–SMF ¶¶29, 36, 37, 40-41); and none of the people deposed, including Plaintiff, saw any individual person in the area of the accident. L–SMF ¶¶42-44.

Despite all these potential sources of evidence, Plaintiff only comes forward with threadbare pieces of circumstantial evidence based soley on his self-serving testimony and the testimony of a single UPS employee who testified about the general day to day operation of the facility. Moreover, to support that a disconnect "was reflected" (to prove Plaintiff had stopped the machine and eliminate the possibility that the machine had turned off for other reasons such as too much weight or a jam) (L–SMF ¶ 35), Plaintiff only points to his own testimony that he disconnected the machine. Pl.'s Opp. to Lyneer Br., PRSMF ¶¶36, 37. To substantiate that a Lyneer employee had affirmatively re-energized the machine, Plaintiff points to a UPS Operations Supervisor's testimony that Lyneer staffers generally would be working in the vicinity of the accident and had some knowledge or responsibility relating to the starting and stopping of the conveyors. Pl.'s Opp. to Lyneer Br., PRSMF ¶¶43-45.

On the other hand, the UPS Operation's Supervisor's testimony suggests that in order to re-energize the conveyor, a Lyneer employee would have to walk over to the disconnect, which

---

[6] The Court will not address whether Defendant Lyneer had a duty of care or whether Defendant Lyneer breached that duty of care because without proximate cause, Defendant Lyneer cannot be held liable.

would have been underneath the cage that Plaintiff was working on, turn the disconnect switch "on," and then walk back to the computer system and restart the belt from the system. Pl.'s Opp. to Lyneer Br., PRSMF ¶45, (citing Douglas Dickinson Dep. Transcript at 64:5-19). Given that a Lyneer employee would have to turn the disconnect switch right below Plaintiff, it seems highly implausible that neither Plaintiff nor a Lyneer employee would not have seen each other and that the Lyneer employee would have failed to recognize that Plaintiff was in the middle of maintenance of the motor cage area.

At this stage, Plaintiff's "circumstantial evidence" is simply mere speculation: that someone from Defendant Lyneer must have re-energized the conveyor system because some employees were present in the building and "had an incentive," (Pl.'s Opp. to Lyneer Br. at 14), to keep the conveyor operational is too tenuous to establish proximate cause and survive summary judgment.

## B. UPS[7]

---

[7] The Court notes that Plaintiff filed a "Master Statement of Material Facts" as an appendix to his Motion in Opposition of Summary Judgment in addition to the required opposing 56.1 statement in accordance with this Court's local rule. Rule 56.1 states:

> On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion. A motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed. The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

> In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition. The movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers. Each statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law.

Plaintiff and Defendant Lyneer argue that Defendant UPS had a nondelegable duty as the owner of the premises and as the delegating, contracting party to provide a safe working environment for its independent contract workers. However, no theory of negligence can be supported based on the material facts in this record.

### i. Premises Liability

The New Jersey Supreme Court has held that "[a]bsent control over the job location or direction of the manner in which the delegated tasks are carried out, the party contracting out the work,[8] be it a landowner or a general contractor, is not liable for injuries to employees of the contractor resulting from either the condition to the premises or the manner in which the work is performed." *Krough v. Calpine*, No. 18-15733, 2020 U.S. Dist. LEXIS 179488 at *7-8 (D.N.J. Sept. 29, 2020), *aff'd* No. 20-3027, _Fed. Appx. _ (3d Cir. 2021) (quoting *Muhammad v. New Jersey Transit*, 821 A.2d 1148, 1156 (2003). A contracting facility still retains a nondelegable duty to use reasonable care to protect invitees against known or reasonably discoverable dangers, but

---

*Id.* Here, it appears that the "Master Statement of Material Facts" does not comply as a "supplemental statement" that is permitted by the rule, because it appears to contain both disputed and undisputed facts. The Court notes that the purpose of a Rule 56.1 statement is to "narrow the issues before the District Court . . . and save [the] court from having to drudge through deposition transcripts [and other immaterial information] . . to determine the facts." *Konowicz v. Carr*, No. 15-06913, 2018 U.S. Dist. LEXIS 176990 at *3 (D.N.J. Oct. 12, 2018). The "Master Statement of Material Facts" is 20 pages long with 87 "facts" that contain more than one fact per numbered paragraph, which aside from the noncompliance with the local rule, it was not tailored to each brief and made it effortful for the Court to ascertain the remaining disputed facts.

In addition, Defendant UPS did not respond to this "Master Statement of Material Facts." The Court notes that the local rules pertaining to motions is supposed to facilitate the court's disposition of motions, and not be a punishment. *Boswell v. Eoon*, 452 Fed. Appx. 107, 111 (3d Cir. 2011) (quoting *Lorenzo v. Griffith*, 12 F.3d 23, 28 (3d Cir. 1993). The rule is usually interpreted strictly against the non-movant, here the Plaintiff, rather than the movant, here Defendant UPS. *Id.* at 112. Given the Third Circuit's preference for resolving matters on their merits, that the Third Circuit "has sanctioned the practice of excusing a party's strict compliance with the local rule where a court is willing to draw out the facts from the party's briefing and evidentiary submissions," (*Fox v. Bayside State Prison*, No. 14-5344, 2016 WL 589673 at *3 (citing *Boswell*, 452 F. App'x at 111-12). and that the "Master Statement of Material Facts" does not comply with the local rule in its submission, the Court will excuse the noncompliance of the rule in this instance only and address the motions on their merits without deeming the facts in the "Master Statement" as admitted to avoid imposing an unfair penalty.

[8] Here, UPS is the party contracting out for the work, and to clearly illustrate this relationship this Opinion will use the term "contracting facility," rather than landowner or general contractor.

this duty is relative to the nature of the invited endeavor. *See Lopez v. Roscio*, No. 03-1770, 2006 WL 319294 at *5 (D.N.J. Feb. 8, 2006). "The duty does not entail the elimination of operational hazards that are obvious and visible to the invitee upon ordinary observation and are part of or incidental to the very work the contractor was hired to perform." *Id.* The contracting facility may incur liability if it retains control over the manner and means by which the work is to be performed, where the work constitutes a nuisance *per se*, or where one knowingly engages an incompetent contractor. *Id.*

### ii. Non-Delegable Duty of Contracting Facilities

It is true that contracting facilities retain a nondelegable duty to independent contractors that are invited on the premises to work in that they are under a duty to exercise ordinary care to render reasonably safe the areas in which she might reasonably expect them to be working. *Id.* at *4 (citing *Sanna v. National Sponge Co.*, 506 A.2d 1258, 1261 (App. Div. 1986)). However, this duty is relative to the invited endeavor. *Id.* at 5 (citing *Rigatti v. Reddy*, 723 A.2d 1283, 1285-6 (App. Div.1999)). This duty does not require a contracting facility to completely eliminate the operational hazards that are obvious and visible upon "ordinary observation" and are "part of or incidental to the very work the contractor was hired to perform." *Id.*

Here, the risk Plaintiff encountered was exactly the kind of obvious risk that was part of the very work his employer hired him to perform. Plaintiff was specifically hired to maintain the TF2-3 conveyor system. UPS–SMF ¶¶8-9. Unlike the contested facts in *Aly v. Fed. Express, Inc.*, Defendant UPS did not modify the TF2-3 system in such a way that would leave the dangerous parts of the machine exposed and unguarded, but in fact had Defendant MHS install cam locks and warning placards on the guard for the nip point hazard. *Aly v. Fed. Express, Inc.*, No. 04-3886, 2008 WL 4378233 (D.N.J. Sept. 22, 2008) (where Federal Express had its conveyor installed or

later modified to be raised above the floor, between three to four feet off the ground, exposing the hazard and leaving the area where the plaintiff was injured completely unguarded, dark, and full of debris); MHS–SMF ¶¶11[9], 13. While Plaintiff contests that the safeguards Defendant UPS contracted for Defendant MHS to install were not adequate, the facts of this case are plainly different from the circumstances found in *Aly*.

Further, it is implausible for Plaintiff to contend that he was unaware of the danger that this machine posed to him regardless of whether he was specifically trained in the LOTO procedure by Defendant SDI. Indeed, Plaintiff had to climb a 20-foot maintenance ladder and push aside a safety guard, which had a lock on it to prevent access from unauthorized personnel, that also had at least one prominent placard stating "Danger, Do Not Open or Remove Guards *Except Authorized Personnel" with a pictogram showing the exact danger that befell him. MHS–SMF ¶11; SDI–SMF ¶9. Further, Plaintiff acknowledged receiving UPS' notice of LOTO procedures and a "SDI Weekly Safety Tailgate Talks" document as well. SDI–SMF ¶13. While a machine specific LOTO procedure may have increased the safety of maintenance workers around the TF2-3 as Plaintiff asserts, a contracting facility like Defendant UPS is not required to completely eliminate all hazards from a work environment, especially those that are part and parcel of the work Plaintiff was hired to do. *Lopez*, 2006 WL 319294 at *5. A contracting facility can assume that an independent contractor and its employees are sufficiently skilled to recognize the dangers of the task they are hired to perform and adjust their methods to ensure their own safety (provided that none of the three exceptions to the rule apply: that the contracting facility retained control over the work being done, that the work being done was a nuisance *per se*, or the hire of an

---

[9] Plaintiff disputes ¶11 insofar as the implication that such installments were sufficient to prevent injury, not the fact that these locks and placards were, in fact, installed on the motor cage in question. Pl.'s Opp. to MHS Br., PRSMF ¶11.

incompetent contractor, discussed further *infra* at Section iii.). *Wilczek v. Phillips 66 Co.*, No. 19-17374, 2023 WL 3644652 at *3 (D.N.J. May 25, 2023).

Additionally, despite Plaintiff's claim to the contrary, OSHA regulations do not apply to contracting facilities, and therefore Defendant UPS would not be specifically required to implement additional training for Defendant SDI's employees regarding the machinery that they were hired to maintain. *Lopez*, 2006 WL 319294 at *5 ("[T]he Court declined to extend liability to the landowner, upon whom OSHA imposes no affirmative duties."). The record is clear that Defendant UPS complied with C.F.R. 1910.147 (f)(2)(i), and Defendant UPS' compliance with C.F.R. 1910.147 (f)(2)(ii) is inapplicable to the scenario that Plaintiff presents. In pertinent part:

> 1910.147(f)(2) Outside personnel (contractors, etc.).
>
>> 1910.147(f)(2)(i) Whenever outside servicing personnel are to be engaged in activities covered by the scope and application of this standard, the on-site employer and the outside employer shall inform each other of their respective lockout or tagout procedures.
>>
>> 1910.147(f)(2)(ii) The on-site employer shall ensure that his/her employees understand and comply with the restrictions and prohibitions of the outside employer's energy control program.

Defendant UPS provided an Outside Contractor Procedures notice regarding its LOTO procedures to Defendant SDI as required by C.F.R. 1910.147 (f)(2)(i), because Plaintiff in fact received this notice and signed it. UPS–SMF ¶¶21-22. Even if Plaintiff found the notice to be unclear or inapplicable to him, Pl.'s Opp. to UPS Br., PRSMF ¶22, Defendant UPS' responsibility was to inform Defendant SDI of their LOTO procedures, not to ensure comprehension or provide additional training to Defendant SDI's employees. According to the plain language of CFR 1910.147(f)(2)(ii), as the on-site employer, Defendant UPS was only responsible for ensuring that *its own employees* understood and complied with the *outside employer's* energy control program.

At this time, Plaintiff does not allege that a UPS employee did not understand or violated Defendant SDI's energy control program by re-energizing the conveyor while it was disconnected not pursuant to the LOTO procedures by Plaintiff, rather Plaintiff asserts that a Lyneer staffer "must have" re-energized the conveyor.[10] Therefore, given this set of facts, CFR 1910.147(f)(2)(ii) is inapplicable.[11]

### iii.  Retained Control Exception

The Parties do not dispute whether the work was a nuisance *per se* or that Defendant SDI was incompetent, rather, Plaintiff and Defendant Lyneer contend that Defendant UPS retained control over the manner and means of Plaintiff's work, thereby rendering it liable for Plaintiff's injuries as the landowner.

A contracting facility's results-oriented supervision does not trigger liability, rather it is the active involvement in changing or directing the method, manner, or means of doing the work that

---

[10] It is not contested that Defendant UPS hired Defendant Lyneer for staffing services as an independent contractor, that Defendant Lyneer was not responsible for Defendant SDI's employees, and that Defendant Lyneer "was not responsible to lock-out or tag-out at the UPS Facility." L–SMF ¶¶15-16, 21, 22.

[11] Plaintiff argues that *Meder v. Resorts Intern. Hotel, Inc.*, 573 A.2d 922 (N.J. App. Div. 1989) is applicable, which held that violations of OSHA regulations by a property owner who has assumed the responsibilities of a general contractor can support a tort claim against the property owner regardless of whether the property owner assumed control over the delegated tasks carried out by subcontractors. *Meder* is inapplicable to this case for several reasons, the most important being that the New Jersey Supreme Court rejected *Meder's* attempt to impose a duty of care on a landowner or contractor based solely on a finding that OSHA regulations had been violated in *Alloway v. Bradlees, Inc.*, 723 A.2d 960 (N.J. 1999). *See Slack v. Whalen*, 742 A.2d 1017, 1021-22 (N.J. Super. Ct. App. Div. 2000). The factors to find liability on a landowner or contractor from *Alloway* include the foreseeability of the risk of injury, the relationship of the parties, the nature of the attendant risk, and the opportunity and ability to exercise care, and the public interest in the proposed solution: in *Alloway*, the risk was "clearly foreseeable" because the contractor "knew" of a defect and attempted to correct the defect, there was a substantial and close relationship between the contractors which created "both the opportunity and capacity . . . to exercise authority and control over the equipment" because the principal excavating contractor specifically took on the supervision of the paving crews because he had direct knowledge of the work requirements. *Slack*, 742 A.2d at 1020. Here, there is no evidence in the record to suggest that Defendant UPS knew of the defect and attempted to correct the defect prior to Plaintiff's accident, and it has not been established that Defendant UPS had the kind of close and substantial relationship that would permit it the opportunity and capacity to exercise the kind of authority and control over the equipment like in *Alloway*. UPS staffers were not involved at all in attempting to maintain the TF2-3 conveyor, as evidenced by the fact that the UPS supervisor requested Plaintiff to address the packages issue in the motor cage on the night of Plaintiff's injury rather than take on the task himself. Pl.'s Opp. to UPS Br., PRSMF ¶19. Therefore, the Court finds that CFR 1910.147(f)(2)(ii) is not applicable to Defendant UPS in relation to its independent contractors in this case.

creates liability. *Krough*, 2020 U.S. Dist. LEXIS 179488 at *8-9 ("this immunity is not disturbed by the exercise of merely such general superintendence as is necessary to insure that the [sub]contractor performs his agreement."). For example, weekly meetings, walkthroughs, and making occasional alterations to a work plan does not demonstrate the level of control that would trigger liability. *Jaworowski v. Ciasulli*, No. 04-1267, 2009 WL 4141474 at *4 (D.N.J. Nov. 20, 2009).

Here, the Court finds that the conduct Plaintiff points to as "control" over the manner and means of his employment is not sufficient to trigger liability. Specifically, Plaintiff asserts that a UPS manager alerting him to the need to remove a blockage in the TF2-3 motor cage is sufficient to show that Defendant UPS had control over Plaintiff's work. *Compare* UPS–SMF ¶19 *and* Pl.'s Opp. to UPS Br., PRSMF ¶19. However, the UPS supervisor did not instruct Plaintiff on how to obtain this result (whether by using a LOTO procedure or some alternative method), (if anything, the request or directive to address an issue with a machine is a typical results-based communication from a supervisor in the context of Plaintiff's work as a maintenance man).

Defendant Lyneer further argues aspects of "control" it finds in the record and asserts that Defendant UPS was interviewed by SDI managers as well as a UPS manager prior to being hired, that UPS was "involved in the decision-making process for the working hours and assignments of the SDI technicians," and "provided" Plaintiff tools necessary for the job[12] and that Plaintiff would "typically communicate with UPS supervisors" and that Plaintiff would "often" communicate "verbally and via email" to UPS management "regarding his job responsibilities," in addition to

---

[12] Defendant Lyneer cites to an SDI employee's deposition transcript, which states that both Defendant SDI and Defendant UPS provided tools for the maintenance technicians to use: SDI provided hand tools and UPS provided power tools for use. Lyneer Def.'s Opp. Br., Lyneer's Counterstatement of Material Facts ¶3, citing Justin Jenson's Dep. Transcript at 38:11-19. The Court reviewed this section of the transcript and notes that it does not suggest that Defendant UPS directed any SDI technician on when, where, or how to utilize such tools regarding the completion of their job. This fact alone, nor in conjunction with the other facts Defendant Lyneer asserts, is sufficient to demonstrate the level of control required to find Defendant UPS liable for Plaintiff's injury.

providing maintenance due to a UPS employee's "complaint" about packages accumulating in the motor cage which resulted in Plaintiff's accident. Lyneer Def.'s Opp. Br., Lyneer's Counter Statement of Material Facts, ¶¶ 1-6.[13]

Here, Lyneer fails to demonstrate any level of managerial involvement beyond general superintendence, and such workplace level coordination does not speak to whether the supervisors directed Plaintiff's actual maintenance activities nor does it demonstrate the "sufficient degree of detailed superintendence over the . . . employees [so] as to invoke a legal relationship analogous to that of master-servant." *Krough*, 2020 U.S. Dist. LEXIS 179488 at *8 (internal citation omitted).

Simply stated, neither Plaintiff nor Lyneer provided sufficient facts to suggest that Defendant UPS had the level of control over the manner and means of his duties as a maintenance technician to strip Defendant UPS of its immunity from liability.

### iv.   Mode of Operation Rule

Next, Defendant Lyneer argues that Defendant UPS should not have immunity from liability as a contracting facility because it believes that Defendant UPS runs its facility as a "self-service" facility and therefore the "Mode of Operation Rule" applies.

The Mode of Operation Rule is a theory that applies specifically to the "self-service" model of a business whereby "customers independently handle merchandise without the assistance of employees" where they "may come into direct contact with product displays, shelving, packaging, and other aspects of the facility that may present a risk." *Senisch v. Tractor Supply Co.*, No. 16-47, 2018 WL 324717 at *5 (D.N.J. Jan. 8, 2018) (quoting *Prioleau v. Ky. Fried Chicken, Inc.*, 122

---

[13] Defendant UPS summarily denied all Defendant Lyneer's Counter Statement of Material Facts without citing to the record, meaning that consistent with the local rules such facts are deemed admitted. Pursuant to L. R. Civ. P. 56.1, the opponent of summary judgment is required to "furnish with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute *and citing to the affidavits and other documents submitted in connection with the motion*." *Id*. (emphasis added).

A.3d 328, 337 (N.J. 2015)). The rule is grounded in the understanding that, without the supervision of employees, there is an increased risk that a dangerous condition will go undetected and that patrons who are permitted to handle products and equipment, will be injured. *Id*. Generally, this theory of liability has mostly applied to cafeteria and supermarket type businesses but has been extended to other types of businesses if a patron is able to select and remove the merchandise form the premises without intervention from any employee of the storekeeper. *Id*.

Defendant Lyneer cannot prevail on this argument because at this facility Defendant UPS is clearly not in the business of permitting the public "customers" to have access to the property. The "invitees" in this matter are independent contract workers who are there to perform specific tasks. Defendant UPS is entitled to presume that the workers, or their superiors, are "possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly." *Lopez*, 2006 WL 319294 at *5. The very nature of Defendant UPS's relationship to Defendant Lyneer and Defendant SDI (Plaintiff's employer) as subcontractors permit it to assume a level of competence and skill that is simply not present in relation to the increased risk that comes when a business is allowing the general masses, with its presumed lack of awareness, to interact with the facility in a self-service capacity. *Rigatti*, 723 A.2d at 1286; *Senisch*, 2018 WL 324717 at *5. Additionally, none of the subcontracting employees were permitted to "select and remove merchandise from the premises." *Senisch*, 2018 WL 324717 at *5. The attempt to analogize the business model of a UPS shipping facility to a self-service styled business falls flat.

Consequently, Defendant UPS cannot be held liable as a contracting facility under a premises liability theory with regard to its independent contractors. Plaintiff's disputed facts are not sufficient to establish negligence liability.[14]

### C.  SDI Industries, Inc.

Plaintiff argues that Defendant SDI is liable for his injuries because Defendant SDI engaged in intentional, wrongful conduct that brought about the accident. However, the facts do not support the finding of intentional, wrongful conduct and therefore Plaintiff's exclusive remedy is the New Jersey Workers' Compensation Act.

#### i.  New Jersey Workers' Compensation Act

Plaintiff argues that Defendant SDI should be held liable for his injuries because their conduct was intentional and malicious. However, in New Jersey the Workers' Compensation Act, ("WCA"), N.J.S.A. 34:15-1 to 128 is the exclusive remedy for workers who are injured at work. In particular, the WCA encompasses all claims against an employer when a worker is injured on the job, regardless of the kind of injury alleged, except for those injuries that have resulted from an employer's intentional wrong. *See Ruggiero v. Eli Lilly & Co.*, No. 19-16206, 2022 WL 17082498 at *8 (D.N.J. Nov. 18, 2022). To demonstrate that the injury stemmed from an employer's intentional wrong, a plaintiff must allege (1) sufficient facts to demonstrate that the employer knew its actions were "substantially certain to result in injury or death to the employee," and (2) that the resulting injury and circumstances surrounding it constituted more than "a fact of life of industrial employment" that is beyond what the Legislature intended the Act to immunize. *Laidlow v. Hariton Mach. Co., Inc.*, 790 A.2d 884, 894 (2002).

---

[14] The Court notes that Plaintiff raises a comparative negligence argument, but because the facts do not support any theory of negligence in the context of landowner and independent contractor liability, the Court need not address the other issue raised.

The first prong, also known as the "conduct" prong, requires the court to carefully ascertain between negligent or reckless conduct with intentional wrongful conduct to prevent the circumvention of the Act, and thus must require the accident as it happened to be a "virtual certainty." *Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 514 (N.J. 1985). To this end, OSHA violations, the manipulation or removal of safety devices, deceptive or underhanded conduct, prior accidents or "close calls" can all be considered evidence in the substantial certainty analysis, however, the absence of such does not preclude a finding of an intentional wrong. *See Cong Su v. David's Cookies*, Nos. 8186-05, 6976-07, 2009 WL 2426336 at *3 (Aug. 10, 2009) (noting that such facts and circumstances generally will be relevant to the second prong as well). The conduct prong of the analysis is an issue of fact, however, if a rational factfinder could not conclude that it was virtually certain that a worker would be injured in the way that it occurred, the issue can be decided as a matter of law. The second prong is a question of law for the court. *Cong Su*, 2009 WL 2426336 at *3 (citing *Laidlow*, 790 A.2d at 898).

### ii.  Conduct

To establish wrongful conduct, evidence related to the disabling of safety devices, prior accidents or close calls, OSHA violations and misrepresentations are the major areas post-*Laidlow* cases have focused on. *See Robinson v. Rheon Automatic Mach.*, No. 10-1916, 2011 WL 832241 at *3 (D.N.J. Mar. 3, 2011). Concealment or intentional deceit is also considered when assessing whether an employer was merely negligent or reckless versus willful conduct. *Fermaintt v. McWane, Inc.*, 694 F. Supp. 2d 339, 345 (D.N.J. 2010). The Court will review each factor in turn.

### 1.  Prior Accidents, Close Calls

Plaintiff has not pointed to any facts that show that there were any prior accidents or close calls that were similar in nature to his accident. Instead, Plaintiff argues that the nature of the

hazard should suffice to give Defendant SDI notice of the substantial certainty of injury from the TF2-3 machine. However, generalized awareness that there are dangerous hazards involved in the work and environment of employees is not sufficient to demonstrate substantial certainty. *Id*. at 347-48. If an employer is conscious of an appreciable risk, or even recklessly or wantonly facing greater risk, it is not the same as willful misconduct—anything short of substantial certainty is not sufficient to establish intent. *Id*. at 344.

Therefore, while the absence of prior accidents does not preclude a finding of an intentional wrong, (*see Cong Su*, 2009 WL 2426336 at *3), the lack of such evidence weighs in favor of finding that Defendant SDI did not have substantial certainty that an injury would occur.

### 2. Intentional Disabling of Safety Devices

Plaintiff points to the fact that the sliding door that was supposed to be locked in the closed position was left unlocked, allowing for anyone to access the hazard, as an intentional disabling of protective equipment. MHS–SMF ¶24. Plaintiff further alleges he was never given the "key" or lock hasp in order to do the LOTO procedure. Pl.'s Opp. to SDI Br. at 10.

The impairment or removal of a safety device does not *per se* equate the employer's conduct is an intentional wrong within the meaning of the WCA. *Madkiff v. Frazier-Simplex, Inc.*, No. A-1328-15T1, 2017 WL 712778 at *5 (Super. Ct. App. Div. Feb. 23, 2017). "Mere knowledge by an employer that a workplace is dangerous does not equate to an intentional wrong" and "it is not enough that 'a known risk later blossoms into reality.' Rather, the standard 'demand[s] a virtual certainty.'" *Id.* (quoting *Van Dunk v. Reckson Associates Realty Corp.*, 45 A.3d 965, 978 (N.J. 2012)). The impairment or removal of a safety device is but one factor to determine whether an "intentional wrong" occurred. *Id.*

When analyzing the risk of a machine that has been "modified" or disabled, the context is significant. For example, as discussed in *Fermaintt* at length, in *Mabee v. Borden*, 720 A.2d 342 (N.J. Super. App. Div. Jun. 2, 1998) and *Laidlow*, safety devices were modified to the point where employees were working without the safety device 95-100% of the time. *See Fermaintt*, 694 F. Supp. 2d at 348. In *Mabee*, the metal shield that was installed to protect employees was modified with a "bypass switch" that allowed the employer to keep the machine running when the metal shield was lifted, which was only supposed to be lifted during maintenance of the machine, exposing employees to this increased hazard 95-98% of the time. *Id*. In *Laidlow*, the employer installed wiring to entirely disable the guard. *Id*.

Here, the fact that the guard was unlocked did not leave the employees completely exposed to the hazard without the protection of any other safety device. *See Fermaintt*, 694 F. Supp. 2d at 348. The motor cage was over 20 feet in the air, still blocked by the sliding door that had warnings with images of the exact accident scenario and injury that Plaintiff suffered depicted on the placards. MHS–SMF ¶11; SDI–SMF ¶9.

Further, Plaintiff has not presented any evidence that Defendant SDI intentionally disabled the sliding door to the motor cage. Even if employees of Defendant SDI did disable the lock, and though doing so posed an obvious risk, New Jersey law does not impose a duty on an employer to prevent an employee from engaging in self-damaging conduct "absent a showing that the employer encouraged such conduct or concealed its danger." *Tomeo v. Thomas Whitesell Constr. Co.*, 823 A.2d 769, 777 (N.J. 2003). Plaintiff has not provided any evidence aside from his own testimony that any SDI managerial employee failed to address LOTO procedures during his orientation. Pl.'s Opp. to SDI Br. at 10; Michael Glass Dep. Transcript, Exhibit P6, 42:15-45. Such self-serving

testimony may be sufficient to survive a motion to dismiss but falls woefully short of the facts

necessary for the case to proceed beyond the summary judgment phase.

Even taking Plaintiff's allegations as true, the evidence does not overcome the applicability

of the WCA, which requires more than an employer "tolerating in the workplace conditions that

will result in a certain number of injuries[,]" but rather requires intentional deceit or intentional

actions that amount to something greater than even wonton, reckless, or gross negligence. *See id*.

at 345; *Madkiff*, 2017 WL 712778 at *3. Therefore, the circumstances described here weigh

heavily in favor of Defendant SDI on this prong.

### 3.  OSHA Citations and Misrepresentations

Plaintiff points to several "serious violations" citations from OSHA following Plaintiff's

accident, including failure to develop a LOTO procedure and failure to adequately train their

employees in the same. Pl.'s Opp. to SDI Br. at 5. Plaintiff asserts that the "serious" classification

on those citations "translates into conditions that create a substantial probability of death or serious

physical harm." *Id*. However, Plaintiff does not provide any evidence to show any *prior* OSHA

violations.

Post-accident OSHA violations are not relevant, as they provide no insight to an

employer's notice of a dangerous condition. *See Fermaintt v. McWane*, Inc., 694 F. Supp. 2d 339,

349 (D.N.J. 2010) ("The case law, however, is clear that the focus of the inquiry is the employer's

pre-accident notice of the dangerous condition by OSHA and intentional deception of OSHA in

order to be able to continue with the dangerous condition."). The absence of prior OSHA violations

does not necessarily preclude a finding that the employer engaged in an intentional wrong,

however, prior OSHA violations and intentional deception of OSHA are useful for the Court in its

analysis because it would demonstrate that the employer had notice of the dangerous condition, and the intentional act of deceiving OSHA further demonstrates the point.

Plaintiff suggests that Defendants SDI and UPS passed around a simplistic LOTO training notice as a way to deceive OSHA into believing Defendants were complaint with OSHA regulations related to LOTO and the dangerous machinery that Plaintiff encountered on the job. Pl.'s Opp. to SDI Br. at 10. This suggestion, without more, is not sufficient to carry Plaintiff's burden through summary judgment.

First, the concept of misrepresentation to OSHA in the caselaw is generally focused on an employer's attempt to overcome known, cited OSHA violations without addressing the hazardous condition, not to preemptively obscure a dangerous situation from OSHA. *See Fermaintt*, 694 F. Supp. 2d at 349. Second, the LOTO training notice was required pursuant to 29 C.F.R. 1910.147(f)(2), which requires a contracting facility (Defendant UPS) to inform its independent contractors (Defendant SDI) of its LOTO requirements. *See* 29 C.F.R. 1910.147(f)(2)(i). This regulation does not require additional affirmative duties on Defendant UPS to give additional training beyond what Defendant SDI would have been responsible for as an employer.[15] Further, the existence of this form cannot be used by Plaintiff to prove that Defendant SDI was attempting to hide an unsafe pre-OSHA violation (because Defendant SDI is the responsible employer pursuant to 29 C.F.R. 1910.147(f)(2) for LOTO training) because it is Defendant UPS's form. SDI–SMF ¶13, citing Ex. E.

To say that Defendant UPS's notification of LOTO requirements was simply a fig leaf used to hide noncompliant practices is just another way of arguing that Defendants failed to sufficiently train Plaintiff and others in the necessary LOTO procedures. As discussed above[16] Defendant UPS

---

[15] *See supra* Section B. ii. Non-Delegable Duty of Contracting Facilities.
[16] *See* n.13.

is not responsible as the contracting facility for training contractors in LOTO procedure, but rather Defendant SDI's.

### 4.  Failure to Train

Here, there are questions of fact as to whether Plaintiff was provided the training or the equipment to perform the LOTO procedure required to accomplish his maintenance work safely. However, they are not material.

Plaintiff asserts that the failure to train Plaintiff is the kind of "instance[] where the employer [knew] that the consequences of those acts [we]re substantially certain to result in such harm" that would bring it under the ambit of an intentional wrong. Pl.'s Opp. to SDI Br. at 4. But, to put it simply, failure to train is the kind of negligence that the WCA was enacted to cover: "[a]llowing an employer to be dragged into litigation on the basis of vague allegations of a failure to train would undermine the WCA and negate the benefit of the bargain for the employer." *Robinson*, 2011 WL 832241 at *4. The WCA is to apply "regardless of the kind of injury alleged, including employment related injuries." *Ruggiero*, 2022 WL 17082498, *8 (citing *Cong Su*, 2009 WL 2426336 at *3) (holding that an employee's claims of "failure to train, failure to supervise, [and] failure to warn" "clearly" fall within the province of the WCA). "[F]ailure to train without more does not evidence the employer's substantial certainty that injury or death would result, [and] is precisely the kind of negligent conduct the legislature intended for the WCA to cover." *Robinson*, 2011 WL 832241 at *4. Ultimately, whether or not Defendant SDI failed to train or properly instruct Plaintiff on the appropriate LOTO procedures or provide the equipment necessary for the same, is not a sufficient basis to find intentional, wrongful conduct committed by the Defendant SDI to enable Plaintiff to circumvent the WCA.

Therefore, the lack of evidence of relevant prior accidents and close calls, the lack of evidence of prior OSHA violations and misrepresentations, and the lack of evidence that Defendant SDI intentionally disabled the machine in question, demonstrates that there are no sufficient, material facts that prove Defendant SDI engaged in intentional wrongful conduct. No rational factfinder could find that Defendant SDI acted with knowledge that it was substantially certain that an injury such as Plaintiff's would have occurred.

### iii.   Context

In relation to the context of the accident, a court must determine whether "the resulting injury or disease, and the circumstances in which it is inflicted on the worker fairly may be viewed as a fact of life of industrial employment, or is it rather plainly beyond anything the legislature could have contemplated as entitling the employee to recover only under the Compensation Act." *Fermaintt*, 694 F. Supp. 2d at 345 (quoting *Millison*, 501 A.2d at 514).

Here, the accident that occurred, while terrible, is the kind of accident that is part and parcel of industrial life: so much so that warning placards reflecting the exact kind of accident that could occur if caution was not taken were placed on the machine itself. MHS–SMF ¶11. As discussed above, Plaintiff simply does not support the claim that he was unaware of the particular danger that this machine posed to him.[17]

There is "a difference between tolerating workplace conditions that will result in a certain number of injuries or illness, and on the other, actively misleading employees" and engaging in intentional wrongful conduct. *Millison*, 501 A.2d at 516. Plaintiff has failed to show that Defendant

---

[17] *See supra* Section B. ii. Non-Delegable Duty of Contracting Facilities.

SDI's conduct reaches the level of "intentional wrong" to overcome the bar of the WCA. Therefore, Defendant SDI's Motion for Summary Judgment must be granted as a matter of law.[18]

### D.  Material Handling Systems, Inc.

Plaintiff argues that Defendant MHS is liable for his injuries because they are the entity responsible for pertinent aspects of the design of the conveyor system, namely, the locks that were placed on the sliding guard door that were not connected to the power source of the machine and which was left unlocked on the night of the accident. The Court finds that Plaintiff has pointed to sufficient contested material facts which must be resolved by a jury.

### i.  New Jersey Product Liability Act ("PLA")

The New Jersey Product Liability Act ("PLA"), N.J.S.A. §2A:58C *et seq.* is the singular path to prosecute a product liability action against a manufacturer or seller for any harm caused by a product "irrespective of the theory underlying the claim," except under breach of express warranty. *See Kemly v. Werner Co.*, 151 F. Supp. 3d 496, 504 (D.N.J. 2015). Defendant MHS asserts that it does not fall into the PLA's statutory provisions because it "did not place the product at issue into the stream of commerce". MHS Def.'s Brief at 31. Put another way, Defendant MHS denies that it is a manufacturer or "product seller" because the PLA imposes strict liability for manufacturers or product sellers that place a product within the stream of commerce. *See Aly v.*

---

[18] The Court notes that Plaintiff submitted with his Opposition an appendix containing a "Master Statement of Material Facts." (ECF No. 128-2). Defendant SDI failed to file a responsive statement to these facts in its Reply. This Court's Local Rules permits a Plaintiff to submit a counterstatement of disputed material facts, which if provided requires a Defendant's reply. *See* L. Civ. R. 56(a) ("In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition. The movant shall respond to any such supplemental statement of disputed material facts as above, with its reply papers."). The Court has reviewed the "Master Statement of Material Facts" which included both uncontested and plausibly contested facts, given the argumentative tenor of the submission. The Court need not split hairs about the appropriateness or compliance of this document with L. Civ. R. 56(a) in this instance because Defendant SDI's motion will be granted as a matter of law, not fact, and therefore any additional facts presented by this document do not alter the Court's resolution.

*Federal Exp. Inc.*, No. 04-3886, 2008 WL 4378233 at *5 (D.N.J. Sept. 23, 2008). The PLA defines

a manufacturer as "any person who designs, formulates, produces, creates, makes, packages, labels

or constructs any product or component of product. N.J.S.A. 2A:58C-8. The act defines a "product

seller" as

> any person who, in the course of a business conducted for that
> purpose: sells; distributes; leases; installs; prepares or assembles a
> manufacturer's product according to the manufacturer's plan,
> intention, design, specifications or formulations; blends; packages;
> labels; markets; repairs; maintains or otherwise is involved in
> placing a product in the line of commerce. The term "product seller"
> does not include:
>
> 1. A seller of real property; or
> 2. A provider of professional services in any case in which the sale
> or use of a product is incidental to the transaction and the essence of
> the transaction is the furnishing of judgment, skill or services; or
> 3. Any person who acts in only a financial capacity with respect to
> the sale of a product.

N.J.S.A. 2A:58C-8. A product seller's liability stems from whether:

> (1) The product seller has exercised some significant control over the design,
> manufacture, packaging or labeling of the product relative to the alleged defect in the
> product which caused the injury, death or damage; or
>
> (2) The product seller knew or should have known of the defect in the product which
> caused the injury, death or damage or the plaintiff can affirmatively demonstrate that
> the product seller was in possession of facts from which a reasonable person would
> conclude that the product seller had or should have had knowledge of the alleged
> defect in the product which caused the injury, death or damage[.]

N.J.S.A. 2A:58C-9(d).

Here, Defendant MHS argues that they were only in the role of a facilitator of the sale,

rather than an active participant in the transaction. MHS Def.'s Br. at 34. However, the pertinent

question is whether Defendant MHS had sufficient control of the product to bring them within the

realm of PLA liability, or whether Defendant MHS knew or should have known of the defect in

the product. *See N.J. Mfrs. Ins. Grp. v. Amazon.com, Inc.*, No. 16-9014, 2022 WL 2357430 at *6

(D.N.J. Jun. 29, 2022) (holding that a product seller can be held liable under the PLA under either provision 9(d)(1) and 9(d)(2) and that a requisite level of "control" was not necessary to establish if the entity was found to be liable under 9(d)(2)).

Here, the Court finds that Defendant MHS fits the definition of a "product seller" under the PLA. It is clear from the contract language that Defendant MHS was contracted to prepare, transport, and install the TF2-3 system in the Swedesboro facility. MHS–SMF ¶2. While Defendant MHS argues that it was not an engineer or the manufacturer of the TF2-3 system, it is clear from the language of the PLA that liability can be applied to any business that "distributes," "installs," or "repairs" a manufactured product "or otherwise is involved in placing a product in the line of commerce." N.J.S.A. 2A:58C-8. The product seller definition reflects and acknowledges that to place a product in the stream of commerce now has many tributaries in an advanced economy. Defendant MHS's contract with Defendant UPS for the transport, installation, and adaptation of the TF2-3 system was not a "professional services" contract where the sale or use of the product is incidental to the transaction—the purpose of the transaction was to transport, install, and adapt the TF2-3 system to the Swedesboro facility and have the conveyor operational. MHS–SMF ¶¶14-15. Nor was Defendant MHS only involved in the transaction in a financial capacity: Defendant MHS installed guard locks at issue in this case and warning placards on the sliding door guards, as well as disconnect switches. MHS–SMF ¶¶8, 11, 13.[19]

---

[19] Defendant MHS argues that it is absolved of responsibility because it installed cam locks to Defendant UPS's specifications. MHS Def.'s Br. at 34. The Court notes that Defendant MHS concedes that the "contract specification defense doctrine" has not been adopted as an "absolute bar." *Id*. The doctrine holds that "a contractor may be absolved from liability to third parties when the contractor's work product is built according to the customer's plans unless those plans are so dangerous that a competent contractor would not follow them." *Id*. The Court declines to adopt this reasoning for several reasons, the most important being that the PLA explicitly carves out N.J.S.A. 2A:58C-9(d)(2) to hold product sellers liable when the product seller knew or should have known of the defect in the product would caused the injury, death or damage based on the facts. To apply the "contract specification defense doctrine" to these facts would impermissibly heighten the required knowledge of the risk beyond the statute's explicit reasonable person standard and could potentially permit savvy but ethically unscrupulous companies contract around situations that the Legislature intended to hold companies strictly liable for.

Here, Defendant MHS focuses on the fact that it did not have title or own the conveyor system, but participated in the sale as a "facilitator," presenting that it did not have the "control" that would permit product seller liability to attach. MHS Def.'s Br. at 33. However, the statute provides liability in the case where the product seller knew or should have known of the defect in the product which caused the injury or there are facts that affirmatively demonstrate that the product seller possessed facts from which a reasonable person would conclude that the product seller had or should have had the knowledge of the alleged defect. N.J.S.A. 2A:58C-8. Therefore, the "lack" of control through holding title or taking possession of the product does not necessarily shield Defendant MHS from liability, especially when considering the Legislature did not add a "control" qualification to the "product seller" definition. *See N.J. Mfrs. Ins. Grp.*, 2022 WL 2357430 at *7.

Plaintiff argues that Defendant MHS knew or should have known that the cam locks it installed were inadequate for the hazard because Defendant MHS is a sophisticated, specialized company in the industry that should have known these specifications would not be sufficient. Pl.'s Opp. to MHS Br. at 12-13, 26. The fact that Defendant MHS attempted to contract around responsibility for the guard door that was attached to the motor cage is irrelevant here, (MHS–SMF ¶¶3-5, 8, 11), because the question is whether Defendant MHS should have known better than to install the "step cam locks" that were ostensibly requested by Defendant UPS.

Here, Defendant MHS may be attempting to minimize its role in the re-construction of the conveyor system for Defendant UPS. In any event, given Defendant MHS's extensive knowledge and expertise in the industry, a jury could plausibly conclude that Defendant MHS knew or should have known that the design of the guard was defective, and therefore granting summary judgment on this issue would circumvent a question of fact best left to the jury.

### ii. Defective Design of Inadequate Guard

Plaintiff argues that the locking mechanism that Defendant MHS installed in the sliding door guard was defective because the conveyor could continue to run while the sliding door guard was in the open position, and in that position, it was a substantial factor in causing his injuries.

The PLA is limited to the manufacturer or seller of a product where the product failed to be "reasonably fit, suitable or safe for its intended purpose" because of a (1) manufacturing defect, (2) inadequate warnings or instructions, or (3) a defective design. *Kemly*, 151 F. Supp. 3d at 505. Plaintiff here alleges that the guard's locking system suffered from a design defect, which requires Plaintiff to demonstrate that (1) a design defect existed at the time of Defendant MHS' manufacture and distribution, and (2) the defect proximately caused his injuries. *Id*.

A "risk-utility analysis" is required to determine whether a product was defectively designed, which endeavors to balance the "danger" posed by the product against the utility attained by the product. *Id*. This analysis branches into two parts.

"First, the fact finder must determine whether the plaintiff used the product in an objectively foreseeable manner." *Id*. (quoting *Indian Brand Farms, Inc. v. Novartis Crop Prot., Inc.*, 617 F.3d 207, 225 (3d Cir. 2010)). If it is determined that the use was objectively foreseeable, the fact finder must determine whether the reasonably foreseeable risk of harm posed by that use could have been reduced or avoided by a reasonable alternative design. *Id*. An injured plaintiff need not prove a specific design defect; the burden is to demonstrate that "something [is arguably] wrong with the product." *Id*. (quoting *Myrlak v. Port Auth.*, 723 A.2d 45, 52 (N.J. 1999).

Second, if a *prima facie* case for design defect is made, a fact finder must then decide whether a plaintiff has offered sufficient evidence to permit a jury to determine that the design defect proximately caused his or her injuries. *Id.* at 506. In circumstances where the defect was

due to the manufacturer's failure to protect against a foreseeable misuse, the determination of the defect necessarily predetermines the issue of proximate cause, but where the defect occurred for reasons other than a particular misuse, a jury must separately determine proximate cause. *Id.* at 506-07. For proximate cause, a court need not decide which of the two circumstances the action in this case falls under, rather it only needs to determine that the defect alleged acted as a substantially contributing or concurring cause of the injury. *Id.*[20]

The issue of proximate cause is typically reserved for the jury unless the facts leading to a plaintiff's injury are so highly extraordinary that the Court decide as a matter of law *Port Auth. V. Arcadian Corp.*, 991 F. Supp. 390, 406 (D.N.J. 1997) (holding that the terrorists' use of defendants' fertilizer products in the bomb that was detonated in the World Trade Center was the kind of "extraordinary" scenario that would permit the court to find, as a matter of law, that the explosion was not proximately caused by the defendants who manufactured and sold the fertilizer products.).

### 1. Foreseeability of Misuse

Defendant MHS argues that it was not reasonably foreseeable that Plaintiff would forego various protective measures, including OSHA regulations, and put his arm into the TF2-3 conveyor. MHS Def.'s Br. at 18.

"Objective foreseeability means reasonable foreseeability. . . at the time of design and fabrication." *Oquendo v. Bettcher Indus.*, 939 F. Supp. 357, 362-63 (D.N.J. 1996). The standard does not impute responsibility for theoretical, remote, or "just possibly" foreseeable, rather it applies to "those future occurrences that, in light of the general experience within the industry

---

[20] The defect need not be the sole cause of harm for proximate cause to be found. The defect only needs to be a substantial contributing factor to the harm suffered. *Id.* (quoting *Perez v. Wyeth Lab.*, 734 A.2d 1245, 1261 (N.J. 1999)).

when the product was manufactured, objectively and reasonably could have been anticipated." *Id.* at 362 (internal citations and quotations omitted). However, misuses that a reasonable seller would believe likely to occur in the normal course of events are "objectively foreseeable" and must be considered. *Indian Brand Farms, Inc.*, 617 F.3d at 227 (3d Cir. 2010). Ease of safety-feature bypass may connote objective foreseeability, however in an industrial setting with complex equipment, expert testimony is necessary to establish whether there is a correlation between safety-defeating ease with objective foreseeability. *Oquendo v. Bettcher Indus.*, 939 F. Supp. at 363. Further, "[e]vidence tending to show common knowledge in a marketplace regarding a likely misuse is not irrelevant to whether that misuse is objectively or reasonably foreseeable." *Indian Brand Farms, Inc.*, 617 F.3d at 227 n.17.

Here, the Court cannot say that as a matter of law Plaintiff's neglect to follow LOTO procedures whilst clearing out packages from the motor cage was not an objectively, reasonably foreseeable event given the nature of the work and the environment (a maintenance technician in a 24-hour mail sorting facility). Plaintiff's conduct, while unwise, is not extreme or extraordinary conduct in an industrial setting. For example, in *Cong Su v. David's Cookies*, 2009 WL 2426336 at *1-2, an untrained worker placed her hand into a biscotti cutting machine, under an intact guard, while it was operating, in an attempt to clear a blockage and was injured. *Id*. The Court is mindful that at some point, commonsense must enter the equation and "If [a] machine is operable without the engagement of the safety function, common sense dictates that a foreseeable user will forego utilizing the safety [mechanism]." *Benitez v. JMC Recycling Sys.*, No. 13-2737, 2017 WL 2815056 at *7 (D.N.J. Jun. 28, 2017). Further, Plaintiff's expert addresses several issues with Defendant MHS's assessment and response to the hazard in this case that could assist the factfinder with any

of the more intricate aspects of industrial machinery. Pl.'s Opp. to MHS Br., PRSMF ¶11 (citing Green Expert Report, Ex. P 1).

### 2. Alternative Design

MHS alleges design defect is not causally linked to the injury, stating the alleged defective design was that the sliding guard could be left open and unlocked. Plaintiff's claim is more nuanced: the design defect is the fact that the lock is not connected to the power, therefore permitting the machine to re-energize while the sliding guard is in the open position, regardless of whether it is locked or unlocked. Plaintiff asserts that the use of an interlock, instead of the cam locks Defendant MHS installed, would have served the purpose of automatically de-energizing the machine while the gate was in an open position and would have prevented his injury regardless of Plaintiff's use or lack thereof a LOTO procedure. Pl.'s Opp. to MHS Br. at 4. Under an alternative design theory, a plaintiff "must [allege] the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm without substantially impairing the reasonably anticipated or intended function of the product." *Stich v. Smith & Nephew, Inc.*, No. 20-13811, 2021 WL 1997411 at *4 (D.N.J. May 19, 2021) (quoting *Hindermyer v. B. Braun Medical Inc.*, 419 F. Supp. 3d 809, 823-24 (D.N.J. 2019)).

Here, Plaintiff's expert points to a machine within the facility called a "VariSort" conveyor which utilizes the type of interlocking mechanism Plaintiff asserts, if present, would have prevented the injury he sustained. Pl.'s Opp. to MHS Br. at 14-17. Plaintiff's expert also notes that the alternative product is "readily available and economically feasible in the marketplace" and has "been designed and field tested by numerous companies for similar applications." *Id*. at 16.

"Except in the rare case when the risk-utility analysis points to the appropriate result as a matter of law, the jury, not the court, ultimately resolves factual issues arising from a risk-utility

analysis." *Stich*, 2021 WL 1997411 at *4 (quoting *Lewis v. American Cyanamid Co.*, 715 A.2d 967, 979 (N.J. 1998)). The case at bar is not one of the rare ones. The Court finds that there are sufficient contested facts about whether the "VariSort" machine is comparable to the TF2-3 to demonstrate the feasibility and reasonableness of the alternative energy disconnecting locking system that Plaintiff asserts would have prevented his injuries. Therefore, the consideration of Plaintiff's proposed alternative design is within the realm of the jury.

### 3. Proximate Cause

If the jury finds that a product is defective, it must then decide whether the misuse proximately caused the injury. *Jurado v. W. Gear Works*, 619 A.2d 1312, 1318 (N.J. 1993). "Even if a defect is a contributing or concurring cause, but not the sole cause, of an accident, the manufacturer will be liable." *Id*. at 1319. However, there are some instances where the issue of proximate cause is predetermined by the finding that the product is defective solely because of the manufacturer's failure to protect against a foreseeable misuse: "[i]f a court determines that a design defect exists [solely] because the manufacturer has failed to include [] safety devices, there is no proximate cause question of any moment left to consider." *Id*. (internal citation omitted).

This is the exact nature of the case at bar. Though Defendant MHS argues that Plaintiff would have had access to the hazard regardless of the locking system because he was "authorized personnel" and would have had a key to gain access even if the guard was fully locked, (MHS Def.'s Br. at 19), this is not the true crux of the argument. Defendant MHS's decision to not include a lock with the ability for the lock to de-energize the machine while unlocked, is what Plaintiff points to as the defect. Pl.'s Opp. to MHS Br. at 13. Plaintiff points to a specific lock that has this type of safety functionality already functioning on a type of mail sorter in the same facility. *Id*. at 13-14.

34

Therefore, the Court believes the facts and circumstances presented here are of the kind that require resolution by the jury.

Here, giving Plaintiff the benefit of every doubt and available inference, summary judgment is denied because reasonable jurors could disagree as to whether the reasonably foreseeable risk of harm posed by the reasonably foreseeable misuse of the TF2-3 guard could have been reduced or avoided by a reasonably alternative design and whether the defective design is a proximate cause of the accident.

### E.  Motion to Exclude Expert Opinion Testimony of John G. Green

Finally, Defendant MHS seeks to exclude Plaintiff's expert testimony because it is "unreliable" and "irrelevant" under the Federal Rules of Evidence Rule 702 and is "legally insufficient." MHS Def.'s Exclusion Br. at 1. In his opposition Plaintiff describes Mr. Green's 35 years of experience as an engineer and his methodology, and sufficiently tethers Mr. Green's opinions to the design of the conveyor as described more fully in Section D. ii. 1 and 2 above. Pl.'s Exclusion Opp. Br. at 7-8, 12-18. Consequently, the Court denies Defendant MHS' Motion to Exclude Plaintiff's expert's testimony finding that Plaintiff's expert testimony is sufficient to survive a motion to exclude because: the opinion provides analysis of copious materials both from this case and from recognized authorities, and touches upon the necessary analytical points of relevance for this matter.

Moreover, Plaintiff's expert addresses the facts relevant to the instant case applicable to the issue of a product design that is not patently defective and involves complex instrumentality. In particular, it appears to the Court that in such cases an expert's testimony is necessary to assist the factfinder in understanding the issues at play, and here, Plaintiff has been assisted by the expert whose analysis establishes these important facts. *See Estate of Popolizio v. Ford Motor Co.*, No.

09-1532, 2013 WL 2459878 at *2 (D.N.J. Jun. 5, 2013). Accordingly, Defendant MHS' critiques of his opinion can be addressed at trial through cross examination.

## V.  CONCLUSION

For the reasons set forth above, Defendants Lyneer, UPS, and SDI's Motions for Summary Judgment are **GRANTED** and Defendant MHS's Motion for Summary Judgment and Motion to Exclude Plaintiff's Expert Opinion Testimony are **DENIED**. An order consistent with this Opinion will be entered.

June 30, 2023                              *Karen M. Williams*

                                          KAREN M. WILLIAMS, U.S.D.J.